IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00341-REB-NRN

BLUERADIOS, INC.,

Plaintiff,

v.

DATACOLOR, INC.,

Defendant.

---

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO DISMISS FOR LACK PERSONAL JURISDICTION
(DKT. #1)**

---

This matter comes before the Court on Defendant Datacolor Inc.'s ("Datacolor")

Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. #1), filed on February 8, 2019

(the same date the case was removed to this Court from Colorado state court). Plaintiff

BlueRadios, Inc. ("BlueRadios") filed an Opposition to the Motion to Dismiss which

attached an affidavit from BlueRadios' principal plus some additional e-mail exhibits

(Dkt. #16 and #16-1.) Datacolor filed a Reply. (Dkt. #19.)

I heard argument on the Motion to Dismiss on April 2, 2019 and took the matter

under advisement. Having considered the argument of counsel, and having reviewed

the briefs, the attached exhibits and the relevant caselaw, I recommend that Defendant

Datacolor's Motion to Dismiss be **DENIED**.

**A. Procedure for Deciding a Personal Jurisdiction Challenge.**

Once a motion has been filed challenging personal jurisdiction over a defendant, "the plaintiff bears the burden to establish the court's jurisdiction, which normally is not a heavy one." 5B Wright & Miller Federal Practice and Procedure: Civil 3d §1351 at 274 (3d ed. 2004). *See also Wise v. Lindamood*, 89 F. Supp. 2d 1187, 1189 (D. Colo. 1999) ("The burden on the plaintiff is light."). In considering a challenge to its jurisdiction, the Court has "considerable leeway" in deciding the methodology for deciding the motion. "The Court may receive and weigh the contents of affidavits and any other relevant matter submitted by the parties to assist it in determining the jurisdictional facts." Wright and Miller, *supra*, at 305. *See also Schramm v. Oaks*, 352 F.2d 143, 149 (10th Cir. 1965) ("Certainly the trial court may gather evidence on the question of jurisdiction by affidavits or otherwise in an effort to determine the facts as they exist.").

When a judge restricts the review of the Rule 12(b)(2) motion solely to affidavits and other written evidence (without taking any testimony), the plaintiff need only make a prima facie showing of personal jurisdiction. Wright and Miller, *supra*, at 288; *Wise*, 89 F. Supp. 2d at 1189 (holding that when the issue is raised before trial and decided on the basis of affidavits and other written materials, "a plaintiff need only make a prima facie showing"). "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *OMI Holdings, Inc. v. Royal Ins. Of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998). "In order to defeat a plaintiff's prima facie showing of jurisdiction, a defendant must present a compelling case demonstrating 'that the presence of some other

considerations would render jurisdiction unreasonable.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

In its Reply in Support of Motion to Dismiss, Datacolor argues that the exhibits attached to the affidavit submitted by BlueRadios (Dkt #16-1), consisting of e-mail communications, should not be considered in deciding the issue of personal jurisdiction. (Dkt. #19.) Datacolor suggests that I should be limited to considering only the allegations in the Complaint and documents referred to or attached to the Complaint. (*Id.*) (arguing that courts want to avoid situations where "a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document on which the plaintiff relied").

Datacolor is mistaken and appears to be confusing the procedure for a motion to dismiss for failure to state a claim under Rule 12(b)(6), with the procedure for deciding a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction.

Indeed, the two cases Datacolor cites for the proposition that I cannot consider exhibits provided for the first time in opposition to a motion to dismiss under 12(b)(2), *Burns v. Mac*, No. 13-cv-2109-WJM-KLM, 2015 WL 4051998 at *4 (D. Colo. July 1, 2015), and *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011), are cases involving motions to dismiss for failure to state a claim under Rule 12(b)(6). In the failure to state a claim scenario, the Court generally *is* limited to considering the complaint and documents referred to in the complaint. But, as noted above, the procedure for pretrial resolution of a motion to dismiss for lack of personal jurisdiction is different.

At oral argument, counsel for Datacolor did not dispute the authenticity of the e-mails provided with BlueRadios' affidavit. Therefore, consistent with the Tenth Circuit's

direction in *OMI Holdings, Inc.*, I will consider both the affidavit submitted by BlueRadios and the attached e-mail documents in making this decision. 149 F.3d at 1091.

In deciding whether BlueRadios has made out a prima facie case of personal jurisdiction, I must view the facts alleged in the Complaint and other materials, including affidavits submitted in opposition to any motion and attached documents, in the light most favorable to the plaintiff—the non-moving party. *See* Wright and Miller, *supra*, at 299 (explaining that courts will "take as true the allegations of the nonmoving party with regard to jurisdictional issues and resolve all factual disputes in his or her favor"); *Wise* 89 F. Supp. 2d at 1189 (where jurisdictional facts are disputed, the court "must resolve all disputed facts and draw all reasonable inferences in the plaintiff's favor").

## B. Background

This is essentially a breach of contract/quasi-contract case involving BlueRadios, a procurer, supplier, and servicer of electrical components, based in Colorado, and Datacolor, the American subsidiary of a Swiss color instrument company, based in New Jersey. As explained at the motion hearing, BlueRadios is a Colorado-based wireless data communications company, specializing in hardware and software solutions allowing for use of Bluetooth wireless communication technology between and among a broad range of electronic devices. Datacolor is, for its part, the American operating company of its Swiss parent, providing customers in a variety of industries (such as photography and design, textile and apparel, paint and coatings, and plastics) with accurate color measurement instruments and algorithms to ensure color consistency worldwide.

Because of the general high technology migration toward wireless communication between devices, Datacolor allegedly sought out BlueRadios' expertise and products, and allegedly asked BlueRadios to place orders for tens of thousands of wireless antennas and tens of thousands of Bluetooth 4.0 modules. After BlueRadios received this request and placed the orders, Datacolor allegedly cancelled its request without compensating BlueRadios.

The gist of Datacolor's motion to dismiss is that it cannot be required to answer a breach of contract lawsuit filed in a Colorado court by a Colorado entity where Datacolor has no presence in Colorado and never physically came to Colorado in connection with the alleged contract.  In short, Datacolor challenges the courts exercise of jurisdiction over it.

**C.  Facts relevant to Datacolor's challenge to personal jurisdiction.**

Based on the allegations of the Complaint and the affidavit and exhibits submitted in opposition to the Motion to Dismiss, the following facts are relevant to the issue of personal jurisdiction:

1.  BlueRadios is a Colorado corporation with its principal place of business in Douglas County. Compl. (Dkt. #4 ¶ 1).

2.  Defendant Datacolor is the United States operating company of Datacolor AG, a Swiss company. Datacolor has its principal place of business in Lawrenceville, New Jersey. (*Id.* ¶ 2.)

3.  NEOTech-On-Core ("Oncore") is a contract manufacturer for and agent of Datacolor. (*Id.* ¶ 3.) As alleged in the Complaint, Datacolor uses Oncore as its agent to enter into purchase agreements on Datacolor's behalf. (*Id.* ¶ 4.)

4. Over several years prior to 2017, BlueRadios and Datacolor (and its agents) conducted business together and established a course of conduct whereby business was conducted (including the ordering and purchasing of products from BlueRadios) through email exchanges, purchase orders, and invoices. (*Id.* ¶ 8.)

5. In each instance of prior business between BlueRadios and Datacolor (or its agents), an order was initiated by Datacolor calling BlueRadios in Colorado by telephone. As early as 2012, Datacolor had been contacting BlueRadios in Colorado for technical support by phone and e-mail. As one example, Datacolor had requested a piece of hardware called BlueRadios Break-Out-Board ("BOB"), and BlueRadios provided Datacolor with guidance on the phone app development. Affidavit of BlueRadios President Mark Kramer ("Kramer Aff.") (Dkt. #16-1 ¶ 3).

6. BlueRadios invoices incorporated by reference BlueRadios' terms and conditions (found on the Internet), to which Datacolor agreed by conducting business with BlueRadios and paying the invoices. Compl. (Dkt. # 4 ¶ 9). BlueRadios' terms and conditions (with which Datacolor had always complied) stated that the law of Colorado would apply to any dispute related to an order. Kramer Aff. (Dkt. #16-1 ¶ 4).

7. All of BlueRadios' customer payments are processed in Colorado and are deposited into BlueRadios' local Colorado bank account. (*Id.*)

8. BlueRadios' website identifies BlueRadios as being located in Colorado. (*Id.* ¶ 5.) Many e-mails sent by BlueRadios use a standard signature block that includes BlueRadios' Colorado address. (*Id.* ¶ 6.)

9. Customers, such as Datacolor, that make industrial technology purchases from BlueRadios cannot place an industrial technology order from BlueRadios via the company's website. Instead, to place an industrial technology order from BlueRadios, a customer must physically call BlueRadios in Colorado to speak with an engineer (who is located in Colorado) to review and place an order. (*Id.* ¶ 5.)

10. In June 2017, Datacolor called BlueRadios in Colorado and requested that BlueRadios provide Datacolor's representative, Oncore, with quotes for 10,000, 50,000, and 100,000 custom-made Bluetooth modules that Datacolor intended to incorporate into a project (the "Project") that would extend over a period of several years and would have a yearly demand of 50,000 Bluetooth modules. On several occasions during the time-period from the initial request for quotes to the final order being placed, Datacolor called BlueRadios in Colorado and sent emails relating to the Project to BlueRadios in Colorado. Compl. (Dkt. #4 ¶ 14); Kramer Aff. (Dkt. #16-1 ¶ 7).

11. At the same time, BlueRadios informed Datacolor that the ceramic chip antenna used in the Bluetooth 4.0 module that Datacolor was using in the Project was being discontinued by the manufacturer, TDK. Purchasing 80,000 antennas would guarantee a supply of the soon-to-be discontinued modules for Datacolor over the next year, while the next-generation replacement module could be incorporated into the Project. Kramer Aff. (Dkt. #16-1 ¶ 8).

12. BlueRadios alleges that, via an e-mail sent by Datacolor to BlueRadios in Colorado, Datacolor accepted the bid and authorized BlueRadios to purchase

82,000 TDK ceramic antennas. As a result of this authorization, BlueRadios placed the order for a last-time buy of TDK ceramic antennas. (*Id.* ¶ 9.)

13. The antennas were to be tested and inspected by BlueRadios in Colorado, prepared for shipping by BlueRadios in Colorado, and, after testing and inspection, reshipped to Datacolor outside of Colorado. Any technical support or warranty work necessarily would have been provided by BlueRadios in Colorado. (*Id.*)

14. Datacolor's authorization for the purchase of antennas and modules is reflected in various e-mails. On March 22, 2018, Kevin Koehler of Datacolor sent an email to BlueRadio's Mark Kramer stating, "As discussed, Datacolor is committed to the 80K antennas for the BR-LE4.0s2a module awaiting your finalized quote." (*Id.*, Ex. 1 at 4.)

15. On March 27, 2018, Datacolor's Patrice Angot (General Manager, Operations) sent an email to Mr. Kramer stating, among other things, "As shared by my colleagues already, we want to continue procurement for BR-LE4.0-S2A module from BlueRadios for one more year time [sic]. (-82k units). . . . So, to summarize, allow me to **share our forecast** (total 82kunits over a year): -- 1st order of 10kunits (placed to you already but pending for approval) –then 6k units to deliver monthly for next 12 months. → **is it clear enough to go forward?**" (*Id.* at 2.) (emphasis in original).

16. On March 29, 2017, Datacolor's Mr. Angot sent another e-mail to BlueRadios' Mr. Kramer that outlined a delivery schedule and stated, in part: "→**I want you to start to work on the procurement and production planning on your side.** -

Datacolor is committing on the total need of 82,000 units of BlueRadio- BR-LE4.0S2A (this email is to confirm it) -We want to start with first 10k order because the order is already in our system, as well as our PCBA vendor (Oncore) and their agent (Pioneer) -We agreed on your statement for full usage of 82,000 units within 2 years.  We may still have open points to discuss but I don't think this should postpone any longer your activities." (*Id.* at 1.) (emphasis in original).

17. Relying on and following Datacolor's directions, on March 29, 2018, BlueRadios issued a non-cancellable purchase order to Panasonic Industrial Company for 50,000 Bluetooth 4.0 modules for Datacolor's project. (*Id.* ¶ 12.) The purchase required Panasonic to ship the modules to BlueRadios in Colorado, where they would be unpacked, be subject to appropriate testing, assembled, and then shipped from Colorado to Datacolor. All technical support, including warranty support, would be provided by BlueRadios in Colorado. (*Id.* ¶ 12.)

18. The BlueRadios order to Panasonic for 50,000 antennas is reflected in the Purchase Order reproduced as Exhibit 2 to the Kramer Affidavit (Dkt. #16-1). The delivery dates in the purchase order reflect that 20,000 antennas are to be delivered "ASAP" while another 6,000 per month are to be delivered from August 2018 through December 2018. These amounts are consistent with the delivery schedule amount reflected in Datacolor's March 29, 2018 e-mail to Mr. Kramer. (*Id.*, Ex. 1 at 1.)

19. BlueRadios does not sell through distributors. All orders are direct business to business sales. (*Id.* ¶ 14.)

20. Unlike BlueRadios, which has only a single business location in Colorado, Datacolor's parent has offices internationally. Datacolor representatives located in China were involved in placing the order at issue. Specifically, Datacolor contacted BlueRadios by phone and followed up with email to discuss procurement options to continue placing orders directly with BlueRadios in Colorado. (*Id.*)

21. One hundred percent of the actions of BlueRadios' personnel related to the Project took place in Colorado, including the original Bluetooth 4.0 design, development, manufacture, assembly, testing, certification, software tools, and development hardware. (*Id.* ¶ 16.)

22. Per the Complaint, Datacolor committed to buy 80,000 antennas and 82,000 4.0 modules. Datacolor authorized BlueRadios to acquire 80,000 antennas and 82,000 Bluetooth 4.0 modules. Datacolor then reneged on the deal, informing BlueRadios that it would not accept delivery of or pay for the 80,000 antennas or 50,000 Bluetooth 4.0 modules. Compl. (Dkt. #4 ¶¶ 32-34).

23. In support of its Motion to Dismiss, Datacolor submitted a very short affidavit from its Corporate Secretary, containing only three substantive statements: (1) that Datacolor is incorporated in New Jersey and has its principal place of business there; (2) that Datacolor is maintained under the laws of New Jersey; and (3) that Datacolor does not have an office or principal place of business in the State of Colorado. *See* Affidavit of Datacolor, Inc. (Dkt. #1-2).

24. In connection with the Motion to Dismiss, Datacolor did not challenge or contradict the factual allegations in BlueRadios' Complaint or in the Affidavit of BlueRadios' President Kramer.

**D. Legal Standard for Asserting Personal Jurisdiction**

A federal court sitting in diversity may only assert personal jurisdiction over a defendant if two criteria are met. "First, a federal district court may only exercise personal jurisdiction over a defendant 'who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located.'" *United States v. Botefuhr*, 309 F.3d 1263, 1271 (10th Cir. 2002) (quoting Fed. R. Civ. P. 4(k)(1)(A)). Second, the exercise of personal jurisdiction under state law must comport with the Fourteenth Amendment's due process clause. *Id. See also Newsome v. Gallacher*, 722 F.3d 1257, 1261-62 (10th Cir. 2013) ("The Constitution allows for personal jurisdiction only when the requirements of due process are met."). However, in Colorado, only one inquiry is necessary because Colorado's long-arm statute "confer[s] the maximum jurisdiction permitted by the due process clauses of the United States and Colorado constitutions," and its requirements are necessarily addressed under a due process analysis. *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1193 (Colo. 2005).

When evaluating personal jurisdiction under the due process clause, the Tenth Circuit conducts a two-step analysis. At the first step, the court examines "whether the non-resident defendant has 'minimum contacts' with the forum state such that he should reasonably anticipate being haled into court there." *TH Agric. & Nutrition, LLC v. Ace European Grp., Ltd.*, 488 F.3d 1282, 1287 (10th Cir. 2007) (citation and quotation marks

omitted). If the defendant has sufficient contacts, the court then proceeds to ask "whether the court's exercise of jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice;'" that is, whether the exercise of jurisdiction is "reasonable" under the circumstances. *Id.* (citation and some quotation marks omitted).

The "minimum contacts" test may be met in either of two ways: general jurisdiction or specific jurisdiction. First, if a defendant has "continuous and systematic general business contacts" with the forum state, it may be subjected to the general jurisdiction of the forum state's courts. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414–16 (1984). Second, even in the absence of "continuous and systematic" contacts, a state's courts may exercise specific jurisdiction over a defendant that "purposefully directed" its activities at the state's residents if the cause of action arises out of those activities. *Burger King*, 471 U.S. at 472–73. S*ee also Benton v. Cameco Corp.*, 375 F.3d 1070, 1076 (10th Cir. 2004) ("A defendant's contacts are sufficient if the defendant purposefully directed its activities at residents of the forum, and the plaintiff's claim arises out of or results from actions by the defendant himself that create a substantial connection with the forum state."). "[T]he shared aim of 'purposeful direction' doctrine has been said by the Supreme Court to ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008) (quoting *Burger King*, 471 U.S. at 475).

Here, BlueRadios does not argue that there is a basis for general jurisdiction over Datacolor. Therefore, I must determine whether Datacolor purposefully directed its activities at Colorado's residents to establish specific personal jurisdiction in this matter.

*See OMI Holdings, Inc.,* 149 F.3d at 1092 ("Purposeful availment requires actions by the Defendant which 'create a substantial connection with the forum state.'") (*quoting Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 109 (1987)). If minimum contacts are established, then I must determine whether the exercise of jurisdiction would be reasonable under these circumstances.

### E. Datacolor had sufficient minimum contacts with Colorado to justify the exercise of personal jurisdiction.

"[W]ith respect to interstate contractual obligations, . . . parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities." *Burger King*, 471 U.S. at 473. However, a single contract between an out-of-state party and a resident of the forum state, standing alone, cannot establish sufficient minimum contacts with the forum. *Id.* S*ee also Ruggieri v. General Well Serv., Inc.*, 535 F. Supp. 525, 532 (D. Colo. 1982) ("[b]ecause a forum-state resident is a party to the contract and it may be foreseeable that his rights in the forum state will be affected is not a sufficient basis for personal jurisdiction"). Prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing, all must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum. *Burger King*, 471 U.S. at 479.

Thus, personal jurisdiction would not be proper in Colorado merely because one of the parties to a contract is a Colorado resident. *Ruggieri*, 535 F. Supp. at 535. *See also SGI Air Holdings II LLC v. Novartis Int'l, AG*, 192 F.Supp.2d 1195 (D. Colo. 2002) (except for the coincidence that the plaintiff and its broker were in Colorado, the

defendants did not initiate any activity that was peculiar to Colorado, did not visit Colorado in connection with the sale of the aircraft, did not personally conduct other business in Colorado, and did not own property on their own behalf in Colorado); *Nat'l Bus. Brokers, Ltd. v. Jim Williamson Prods., Inc.*, 115 F. Supp. 2d 1250, 1254 (D. Colo. 2000) (finding no personal jurisdiction where defendant entered into two listing agreements with plaintiff and initiated telephone and fax communications with plaintiff regarding those agreements, but had no other contacts with Colorado); *Automated Quill, Inc. v. Chernow*, 455 F. Supp. 428, 429 (D. Colo. 1978) (no personal jurisdiction where defendants did not come into Colorado for either negotiations or execution of the licensing agreement in question; they did not initiate any activity peculiar to Colorado which was undertaken on defendants' behalf; the licensing agreement in question was not issued in conjunction with any other Colorado activity; and the defendants' activities as licensees were not specifically directed to Colorado).

But equally important to this analysis is the fact that, in the context of a commercial contract, the physical presence of a defendant in the forum is not necessary to establish personal jurisdiction. As the Supreme Court said in *Burger King*,

> it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications . . . . So long as a commercial actor's efforts were 'purposefully directed' towards residents of another State, we have consistently rejected the notion that an absence of contacts can defeat personal jurisdiction there.

471 U.S. at 476. The defendant must therefore have "deliberately" created some relationship with the forum state that would serve to make that state's potential exercise of jurisdiction foreseeable. *Id.* at 475–76. Again, with respect to "interstate contractual obligations, . . . parties who reach out beyond one state to create continuing relationships and obligations with another state are subject to regulation and sanctions

14

in the other state for the consequences of their activities." *Id.* at 473. *See also Pro Axess, Inc. v. Orlux Distribution, Inc.*, 428 F.3d 1270, 1277 (10th Cir. 2005) (same).

In this case, we have Datacolor, an out-of-state defendant, entering into a contract with a Colorado company. That alone is not enough to establish personal jurisdiction. We also have the fact that Datacolor never set foot in Colorado and has no physical presence here. But the lack of physical presence is not enough to deny personal jurisdiction. "The mere quantum of contacts between the forum and defendant is not determinative. Rather, the quantity of the contacts, their significance to the venture, and the overall purpose of the parties' efforts all factor into the assessment of the sufficiency of the contacts." *G&G International, LLC v. Camsing Company, LLC*, C.A. No. 09-cv-00366-MSK-MEH, 2010 WL 466812 at *2 (D. Colo. Feb. 9, 2010).

I find that BlueRadios' allegations are sufficient to demonstrate that Datacolor purposefully directed its activities towards Colorado. This was not a one-off purchase of a product via the internet. The allegation is that Datacolor had a multiyear business relationship whereby Datacolor purchased goods, technical assistance, and warranty services from BlueRadios in Colorado. *See* Kramer Aff. (Dkt. #16-1 ¶ 3). Each order was initiated by Datacolor calling BlueRadios in Colorado. BlueRadios' terms and conditions, listed on their website and incorporated in the invoices sent to Datacolor, noted that the law of the State of Colorado would apply to any dispute. Both BlueRadios' website and many of its e-mail communications made clear that BlueRadios was located in Colorado. This should be enough for Datacolor to know that it could be haled into court in Colorado.

With respect to the alleged contract (or quasi-contract) that is at issue in this case, the Complaint alleges that Datacolor or its agents contacted BlueRadios for the purpose of acquiring tens of thousands of antennas and modules to be supplied over the course of months for a Project that would extend over the course of a year or more. Accepting the allegations as true, Datacolor must have known that it was entering into a relatively long-term business relationship with a Colorado company, and its alleged actions (encouraging BlueRadios to procure antennas and modules for the Datacolor Project) necessarily would have effects and an impact on a Colorado business. Per Datacolor's requests, significant performance was required of BlueRadios in Colorado. BlueRadios had to procure the electronic components, have them delivered in Colorado, have them tested in Colorado, and then have them shipped out of Colorado to Datacolor. The alleged contract called for extensive performance by BlueRadios in Colorado. It is clear that Datacolor initiated, for its benefit, activity particular to the state of Colorado. *Compare Automated Quill, Inc. v. Chernow*, 455 F.Supp. 428, 432 (D. Colo. 1978) (finding no personal jurisdiction based on contract, in part because defendants "did not initiate any activity particular to Colorado which was undertaken on defendants' behalf").

As the Supreme Court said in *Burger King*, prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing, must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum. 471 U.S. at 479. Based on the allegations in the Complaint, these factors establish that Datacolor had the requisite minimum contacts in this case.

Supporting my conclusion is the factually similar case of *Pro Axess, Inc. v. Orlux Distribution, Inc.*, 428 F.3d 1270 (10th Cir. 2005). In *Pro Axess,* a French company, Sporoptic, decided to launch a line of low-cost sunglasses in the United States. The sunglasses would be manufactured in Asia. Without the necessary expertise to make proper arrangements for manufacturing in Asia, Sporoptic contacted Pro Axess, a Utah company that had the requisite prior experience. As part of the project, Sporoptic contracted with Pro Axcess to arrange for the manufacture and delivery of 28,000 sunglasses frames. *Id.* at 1275. Although the frames would be manufactured in Asia, the contract necessarily anticipated that Pro Axess would provide certain services in Utah, including choosing a manufacturer, arranging for handmade models to be made into machined prototypes, arranging for the inspection of the frames in Hong Kong, invoicing and coordinating the manufacturing process, and arranging for the shipping of the frames from Hong Kong to France. *Id.* at 1277. The Tenth Circuit found it significant that although the shipping and manufacturing were not to take place in Utah, "services necessary for the contract were to be performed in Utah." *Id.* The Tenth Circuit also found that although the agreement in question was a single contract, "fulfilling the contract required a continuing relationship based on the provision of services. By procuring such services from Pro Axess, which operates its business in Utah, Sporoptic 'purposefully availed itself of the privilege of conducting activities within the forum State'." *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

The Tenth Circuit in *Pro Axess* also noted the various direct communications between Sporoptic and Pro Axess: contacts that occurred while Pro Axess and Sporoptic were building a business relationship and maintaining that relationship.

"Although 'phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts,' . . . such materials provide additional evidence that Sporotic pursued a continuing business relationship with a Utah corporation." *Id.* at 1277-78 (citation omitted) and n.5.

The contacts between Sporoptic in France and Pro Axess in Utah, were even less significant than those between Datacolor in New Jersey, and BlueRadios in Colorado. Based on the Tenth Circuit's reasoning in its *Pro Axcess* decision, Datacolor, by reaching out to Colorado and entering into a contract that required the provision of distinct, long-term services in Colorado, and communicating regularly via telephone and e-mail with BlueRadios in Colorado, Datacolor established the necessary minimum contacts to support personal jurisdiction in Colorado.

In sum, Datacolor's contacts with Colorado were by no means the kind of "random, fortuitous or attenuated contacts" warned about in *Burger King. See also Oaster v. Robertson*, 173 F. Supp. 3d 1150, 1164-65 (D. Colo. 2016) (finding personal jurisdiction in breach of contract action against non-Colorado defendant, based on scope and length of agreement, along with the parties' course of dealing, showing an intent to engage in significant amount of business with the plaintiff's Colorado-based business); *AST Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054 (10th Cir. 2008) (finding personal jurisdiction in Colorado over a British company defendant in breach of contract case, where parties did business together over a period of years via telephone and e-mail).  Based on the anticipated future consequences of this continuing business relationship, I find that Datacolor purposefully directed its activity towards a resident of Colorado.

Datacolor in its Reply argues strenuously that BlueRadios' unilateral activity in Colorado cannot form the basis for personal jurisdiction over Datacolor. (Dkt. #19 at 4-5). Citing a Colorado Supreme Court case, Datacolor insists that "**the actions of the defendant,** and not those unilaterally taken by someone else, are significant in determining whether the defendant personally availed himself of the privilege of conducting business in the forum state." (*Id.*) (emphasis in original) (quoting *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1194 (Colo. 2005)). But here, Datacolor entered into a contract with BlueRadios knowing that it would cause BlueRadios to act and incur obligations in Colorado. This was not unilateral conduct by BlueRadios. It was conduct prompted by Datacolor's alleged order for tens of thousands of electronic components from a Colorado-based company which necessarily caused results and consequences in Colorado. *Cf. Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp. 3d 1224, 1238 (D. Colo. 2014) (a foreign party's entry into non-disclosure agreement with Colorado plaintiff and purchase of product for the plaintiff was activity directed at Colorado and created sufficient relationship between plaintiff and defendant to justify personal jurisdiction).

### F.  There is a nexus between Datacolor's contacts and BlueRadios' injury.

Next, given that this is a breach of contract case, it almost goes without saying that BlueRadio's alleged injuries arise out of Datacolor's contacts with Colorado. The allegation is that Datacolor purposefully directed its activities at Colorado, in part by entering into a contract (or quasi-contract) with BlueRadios, and directing BlueRadios to procure for and deliver to Datacolor tens of thousands of electronic components. Datacolor's alleged breach of that agreement is what caused BlueRadios' alleged

injuries and motivated this lawsuit. This satisfies the requirement that the plaintiff's injuries "arise out of" the defendant's contacts with the forum. *Didnikov*, 514 F.3d at 1078-79. *See also Pro Axcess*, 428 F.3d at 1278-79 (explaining that where the plaintiff is alleging a breach of contract, and the breach of contract claims arise from solicitation of plaintiff, the development of a business relationship, and subsequent communications, the claims necessarily arise out of the contacts with the forum state and provide the requisite "nexus").

### G. Exercising personal jurisdiction over Datacolor would not offend traditional notions of "fair play and substantial justice."

Having concluded that, at this stage of the litigation, BlueRadios has met its burden of establishing minimum contacts, I must still inquire whether the exercise of personal jurisdiction would "offend traditional notions of fair play and substantial justice." *Dudnikov*, 514 F.3d at 1080. With minimum contacts having been established, in opposing jurisdiction, it is incumbent on Datacolor to "present a compelling case" that the presence of some other considerations would render the exercise of jurisdiction unreasonable. *Id.*

In making the "fair play" inquiry, courts traditionally consider factors such as (1) the burden on the defendant, (2) the forum state's interests in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effectual relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states [or foreign nations] in furthering fundamental social policies. *Dudnikov*, 514 F.3d at 1080; *OMI Holdings,* 149 F.3d at 1095.

On this score, Datacolor has not presented any case, much less a compelling one, that the exercise of jurisdiction over this American subsidiary of a multinational

company would be unreasonable. Datacolor's entire argument is based on the several short sentences in Datacolor's affidavit asserting that Datacolor has no presence in Colorado and has never been in Colorado. But, as noted above, physical presence, or lack thereof, in Colorado is not determinative one way or another. Datacolor has presented no evidence and no argument addressing the "fair play and substantial justice" criteria. In making my own assessment (without the benefit of any argument by Datacolor), I conclude that none of the factors listed above seem to weigh in Datacolor's favor.

There appear to be two potential fora for this lawsuit: Colorado and New Jersey. Presumably, there are witnesses from the two sides located in both locations. The burden on Datacolor of coming to defend in Colorado is not materially different from the burden on BlueRadios of going to New Jersey to prosecute the case. As the Tenth Circuit has said,

> As in any case in which the parties reside in different fora, one side must bear the inconvenience of litigating 'on the road.' While admittedly a burden, defendants have not indicated that their defense of this case would be hindered by the territorial limits on the Colorado district court's power to subpoena relevant witnesses, or indeed hampered in any other significant way.

*Dudnikov*, 514 F.3d at 1081.

In terms of the burden on Datacolor of defending this case in Colorado, Datacolor is part of an international company with offices around the world. There is no indication that it will be unfairly burdened by having to appear in Colorado to defend this case. And, as noted in *OMI Holdings*, "[s]tates have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors." 149

F.3d at 1096. Colorado has such an interest here. None of the other factors would preclude the exercise of personal jurisdiction over Datacolor in this case.

**Conclusion**

Viewing all the allegations in the light most favorable to Plaintiff BlueRadios, for the reasons stated above, I find that Plaintiff BlueRadios has met its relatively light burden of establishing a prima facie case of personal jurisdiction over Defendant Datacolor. I therefore **RECOMMEND** that Datacolor's Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. #1) be **DENIED.**

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, *Thomas v. Arn*, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colorado Dep't of Corrections*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Dated:    April 12, 2019
              Denver, Colorado

*N. Reid Neureiter*
N. Reid. Neureiter
United States Magistrate Judge